JOHN BLACKBURN AND OTHERS, PLAINTIFFS IN ERROR, V. EMILY OSTRANDER, DEFENDANT IN ERROR.

5 219
6 401
6 490
7 285
15 221
16 537
17 493
5 219
26 512

1. **Practice**: VERDICT. An order of the court below overruling a motion for a new trial for the reason that the verdict of the jury was against the weight of evidence, will not be disturbed, unless it be very clearly so.

2. ———: PREPONDERANCE OF EVIDENCE. Mere preponderance of testimony against the verdict is not enough to warrant the court in disturbing it.

3. ———: ———. It is not the number of witnesses produced by a party, nor their language alone, that should be looked to in determining whether a new trial should be granted, but all the surrounding circumstances should be taken into the account and given due weight.

ERROR from the district court of Saline county.

*McKillip & Page*, for plaintiffs in error.

*Hastings & McGintie*, for defendant in error.

LAKE, CH. J.

There are several errors formally assigned, but in substance they amount simply to this, that the verdict is not sustained by sufficient evidence. The action in the court below was on a promissory note, given by the plaintiffs

in error, on the sale of a horse, November 26, 1868. The answer alleges, as ground of defense, that at the time of said sale the horse, for which the note was given, was diseased of the glanders, which the plaintiff well knew but fraudulently represented the animal to be sound. Issue being joined on this defense, the case was tried to a jury and a verdict returned in favor of the plaintiff for the full amount of the note.

An examination of the record reveals considerable conflict in the testimony. Several witnesses called by the defense testified, that in their opinion the horse was diseased as charged. William Houck was the first witness who swore that the disease was glanders; but he did not see the horse until the spring of 1870, more than a year after the sale took place. Ezekiel Pettit saw the horse in Camden a day or so after the sale; and he swears that he then noticed a discharge from the nostrils and "remarked that the horse had the glanders." Isaac Vose, who is a brother in-law of Blackburn, saw the horse about the same time he was noticed by Pettit in 1868, and he, too, was of opinion that the disease was glanders. Another witness, by the name of Adams, called for the defense, was of the opinion that the horse was afflicted with the glanders. This constituted the material testimony adduced on the part of the defendants. On the other hand, the plaintiff testified on her own behalf, giving an account of the transaction by which she sold the horse to Blackburn. She denies that she had any knowledge of the horse being unsound at the time, or that she made any recommendation concerning him. She also testifies that no claim was ever made to her by the defendants that the horse was diseased in any manner whatever. Moses Wilson, a witness called on behalf of the plaintiff, swore that he knew the horse at the time of the sale, and afterwards frequently saw Blackburn breaking prairie with him. He says that

during all the time that he knew the horse, up to the middle of 1869–70, "the appearance of the horse was good." This witness testified also, that at one time Blackburn told him that the horse had what was known as the "nasal gleet." The deposition of Thomas J. Hudson was next read. This witness testified, among other things, that he knew the horse in controversy; he had him in his possession about three months before the sale to Blackburn; the animal was then sound and in good condition. He "was a hearty horse, and ate and drank well." He noticed that there was at one time a slight discharge from the nose, but considered that it was caused by an "attack of horse distemper." This horse was kept with his own horses, and drank out of the same pail; and yet no disease was communicated to them in consequence thereof. This witness testified further, that he had two conversations with Blackburn about the note in question. He says: "The first conversation took place in Lincoln, I think in Brock's bank, about eleven months after the note was given, and while it was in my possession. At that time he spoke favorably about paying the note. He said he was hard up, had met with some losses, and didn't want the note pushed. * * * The substance of the conversation was that he would pay the note as soon as he could get the money. The second conversation I had with Mr. Blackburn was in Lincoln, three or four months after the note became due. I think he asked me if I still had the note. I think I told him I had delivered it to Mrs. Ostrander; I cannot remember the language used, but the substance of it was that he would not pay the whole note; that he wanted fifty or seventy-five dollars thrown off; that his mules and his horse had died from the disease they had taken from this horse." In answer to the question, whether during the first conversation Black-

burn made any complaint that the horse was unsound, this witness answered, "*He did not.*"

If we look alone to the language used by the several witnesses as to whether the horse actually had the glanders, there would seem to be a pretty clear preponderance in favor of the defendants (plaintiffs in error). But there are several circumstances entitled to considerable weight in the decision of this case. The fact that this horse was taken by Blackburn, and worked by him continuously on his farm for considerably over a year without any complaint, or so much as even a suggestion to Mrs. Ostrander that anything was wrong with him, is a very strong circumstance against the theory of the defense. It seems very strange, indeed, that if Blackburn had supposed, or had reason to believe, that the horse was affected with so fatal a malady as that of glanders is well known to be, he would have kept on using him for so long a time without so much as complaining even to his vendor. Under such circumstances, this sort of defense should be closely criticised by a court and jury; and unless established very clearly, it ought not to be permitted to prevail. When the purchaser of an article ascertains, or has reason to believe, that he has been deceived by the fraudulent representations of his vendor, common prudence would seem to dictate that he make it known, and notify the seller either of his desire to rescind the contract, or that he will claim compensation for his loss. Indeed, it is but just to the vendor that this course be pursued. But where, as in the case before us, the property is purchased on a credit, and no word of complaint is heard for more than a year after the sale, while at the same time the property is kept in constant use, this sort of defense ought to be closely scrutinized.

This is a case of very conflicting testimony, one wherein all the surrounding circumstances are hostile

to the claim of the defendants, and also to the testimony of a majority of the witnesses. It is a case peculiarly suited to a jury trial, wherein the character and appearance of the witnesses, as well as the words they utter, can be considered and weighed by twelve of their fellow-citizens, who, from their knowledge of human nature and of the motives by which men in such transactions are commonly actuated, are so much better qualified than is a single judge or a court to decide the questions of fact correctly. We are of opinion, therefore, that the judgment should be affirmed.

JUDGMENT AFFIRMED.